UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE DAVIS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 12 C 3992 |
| BNSF RAILWAY COMPANY d/b/a BURLINGTON NORTHERN SANTA FE RAILWAY COMPANY, | ) ) Judge Rebecca R. Pallmeyer ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff George Davis, a long-time employee of Defendant BNSF Railway Company d/b/a the Burlington Northern Santa Fe Railway Company, alleges he was unfairly disciplined for a safety violation in his previous job assignment as an engineer. Now employed as a conductor for BNSF, Davis claims he was removed from the engineering position on the basis of race and in retaliation for an earlier charge of discrimination, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq., and 42 U.S.C. § 1981. He alleges, in addition, a hostile work environment and breach of contract. Defendant BNSF seeks summary judgment [60]. BNSF argues that the undisputed facts show that Davis cannot establish his claims under either the direct or indirect methods of proof. For the reasons set forth here, the motion [60] is granted.

## FACTS

The summary judgment record is substantial, but both sides have complied with the court's Local Rule 56.1, setting forth their statements of facts supported with citations to the record. The facts are in large part undisputed.

Plaintiff Davis was hired by BNSF in 1979 and has worked as a laborer, a train conductor, and, since 1988, as an engineer. (Pl.'s Resp. to Def.'s 56.1 Stat. of Mat. Facts, [66] hereinafter, "Pl.'s 56.1 Resp." ¶ 3; Def.'s Resp. to Pl.'s 56.1 Stat. of Mat. Facts [70], hereinafter,

"Def.'s 56.1 Resp," ¶ 2.) BNSF, a railroad company, provides freight services (i.e., transportation of goods) and passenger services in the Chicago area. (Pl.'s 56.1 Resp. ¶ 6.) Timothy Merriweather, the Terminal Superintendent for Chicago, oversees the train, yard, and engine workers, including engineers, conductors, trainmen in freight, and passenger services. (*Id.* ¶ 4). Like Plaintiff Davis, Merriweather is African-American. (*Id.* ¶ 5.)

## I. BNSF Disciplinary Policy

The parties agree that BNSF assesses discipline for rules violations in accordance with company policies and rules and the applicable collective bargaining agreement. The disciplinary standards, presumably a product of history and bargaining, are complicated. They are set forth in documents identified as the "Policy for Employee Performance Accountability ('PEPA')" and the "CB&Q, GN, NP, Engineers Alternative Handling Agreement ('Alternative Handling Agreement') also known as the Safety Summit." (*Id.* ¶ 9.)[1] Discipline is based on the employee's disciplinary history and the type of violation. (*Id.* ¶ 7.) The PEPA classifies violations as Serious, Non-Serious or Dismissible, and dictates the type of discipline to be imposed for each violation. (*Id.* ¶ 10.) Some of this information is set forth in a chart submitted as part of Defendant's Rule 56.1 Statement. For a Non-Serious Rule Violation, an employee may be offered "alternative handling" (described below). Any subsequent Non-Serious Rule Violation within a rolling 12-month period will result in suspension, the length of which depends on the number of prior rule violations. (*Id.* ¶ 11.) The policy defines a Serious Rule Violation as, for example, a violation of a safety procedure, or of an operating rule for which "FRA [Federal Railroad Administration] engineer decertification is also mandated," extended unauthorized absence, use or possession of drugs or alcohol, tampering with safety devices, or EEO policy infractions. (*Id.*) The chart does not set forth the discipline appropriate for such an offense, but does state that a second serious incident within a 36-month period will result in dismissal, and

---

[1] The parties have not explained the origin of the initials "CB&Q, GN, NP, or SP&S." Nor is the court certain whether it is the Alternative Handling Agreement, or both that Agreement and the PEPA, that is known as the Safety Summit.

that the 36-month review period will be reduced to 12 months for any employee who has been injury-free and discipline-free for five years before the serious offense. Finally, the chart lists four categories of Dismissible Violations: a single aggravated offense; two serious rule violations within a worker's probationary period, five violations of any kind within 12 months or four active attendance violations. (*Id.*)

When an infraction occurs, the train, yard, or engine worker involved may receive discipline after an investigation; may waive the investigative hearing and accept the proposed discipline; or may under some circumstances receive "alternative handling," described as "an alternative approach to discipline that stresses training and counseling" over punishment. (*Id.* ¶¶ 8, 12.) An employee is eligible for "alternative handling" only if he or she accepts responsibility for the violation. (*Id.* ¶ 13.) Although it is not reflected in the chart submitted by Defendant, the PEPA authorizes "alternative handling" even for serious rule violations "[i]n some cases." (PEPA, Ex. 1 to Timothy Merriweather Aff. [61-4], 3.) Where an employee receives "alternative handling," the infraction is not recorded in his file nor considered in determining what discipline is appropriate for any subsequent infractions. (Pl.'s 56.1 Resp. ¶ 12.)

Like the PEPA, the Alternative Handling Agreement also classifies violations; confusingly, these classifications are similar but not identical to those established by PEPA. For the purposes of the Alternative Handling Agreement, a "Class I" violation is a serious infraction that could result in a Federal Railroad Administration fine, an accident or injury or decertification, or a violation of a rule designed to protect individuals or equipment. (*Id.* ¶ 14.) A "Class II" violation is an infraction that does not result in damage or injury; and "Class III" violations are all other rule violations, including attendance and "missed call" violations. (*Id.*) That "alternative handling" may be available even for a serious rule violation is confirmed in Mr. Merriweather's affidavit; he explains that an employee is not eligible for alternative handling if he has had alternative handling for a serious violation three times previously or has had any serious violation in the previous 12 months. (Merriweather Aff. ¶ 13.)

3

The parties agree that an employee "may also qualify for a Waiver after a rule violation." (Pl.'s 56.1 Resp. ¶ 16.) Precisely how this advantages the employee is not entirely clear to the court. The "Waiver process" requires the employee to admit he is at fault, waive the disciplinary hearing otherwise required, and accept discipline in accordance with the PEPA. Merriweather's affidavit asserts, and the parties agree, that an employee facing a "Dismissible offense" is not eligible for a Waiver. (Merriweather Aff. ¶ 15.) He also asserts, somewhat inconsistently (but again, the parties agree) that an employee may choose to "take a Waiver in order to avoid . . . dismissal." (*Id.;* Pl.'s 56.1 Resp. ¶ 17.) The parties also agree that an employee who does not qualify for alternative handling or for a Waiver must participate in an investigation hearing. (Pl.'s 56.1 Resp. ¶ 18.)

## II. September 22, 2009 Incident

On September 22, 2009, Plaintiff was working as the engineer on a suburban commuter train *en route* from Union Station in Chicago to Aurora. (*Id.* ¶ 19.) As engineer, Plaintiff had sole control of the train's speed and movement. (*Id.* ¶ 20.) It is undisputed that Plaintiff violated rules: he moved the train at 53 miles per hour in a 40 miles-per-hour zone, passed through a stop signal without stopping, failed to alert his dispatcher of the violation, and failed to alert other train engineers of a hazard by radioing the words "emergency, emergency, emergency," a safety measure he acknowledges is crucial. (*Id.* ¶¶ 21–23.) Plaintiff admits, further, that he failed to admit what occurred until the next day, and that his conduct in failing to report the incident or announce the emergency was "deemed as an attempt to hide his speed and signal rule violation." (*Id.* ¶ 25.) Defendant asserts that Plaintiff was "ineligible for Alternative Handling" under Part I, Section II (e) of the Alternative Handling Agreement. (Def.'s 56.1 ¶ 25.) Plaintiff denies this, but cites no evidence to rebut it. The court notes that Section III of the document referred to as the "Alternative Handling Agreement" provides that alternative handling is not available for certain offenses, including a "violation of a personal conduct rule such as dishonesty, felony conviction, physical altercation." (Memorandum of Agreement, Ex. 2 to

4

Merriweather Aff. at 2.) After an investigation hearing, Defendant imposed a 30-day "record suspension" (that is, a suspension reflected in the records but which does not prohibit the employer from working) and three-years of probation as discipline for the September 22 incident. (Pl.'s 56.1 Resp. ¶¶ 24, 46.) Plaintiff now contends he was "held out of service for fifty-four days" as a result of the September 22, 2009 incident. (Def.'s Resp. ¶ 5.) As he acknowledged at his deposition, however, the discipline imposed was in fact a 30-day suspension, and during a record suspension, he could "still work as a train [sic], but not as an engineer." (Davis Dep., Ex. 2 to Def.'s 56.1 [61-2], 22.)

### III. Mediation Agreement

Plaintiff filed a charge with the EEOC, challenging the discipline as a product of race discrimination. (Pl.'s 56.1 Resp. ¶ 26.) On April 9, 2010, he entered into an agreement with Defendant to settle the dispute, under which his three-year probation was reduced to just one year starting on November 20, 2009. (*Id.* ¶ 28, 33.) He entered into the agreement voluntarily and understood that any additional "Class I" violation during the probationary period would result in dismissal or other discipline. (*Id.* ¶¶ 29, 30.) The parties agreed, further, that Defendant did not admit that the original discipline violated Title VII; that Defendant would not discriminate or retaliate against Davis as a result of the filing of the charge; and that Plaintiff would withdraw the charge of discrimination. (*Id.* ¶¶ 31-32; Def.'s 56.1 Resp. ¶ 7.)

### IV. October 7, 2010 Incident

On October 7, one month before the end of the reduced probationary period, Davis committed another "Class I serious rule violation": he failed to comply with an "approach medium" signal, which directs the engineer that he must not exceed 40 miles per hour at the next signal passage, and must then enter the "diverging route at the prescribed speed." (Pl.'s 56.1 Resp. ¶ 35.) When he reached the next signal (referred to as a "diverging clear" signal), Davis was expected to cross from one track to another at a speed of 12 miles per hour. (*Id.* ¶ 36.) Instead, he "entered the cross" at 53 miles per hour and had to stop the train by "placing

5

it into emergency." (*Id.*) Plaintiff admits that a passenger complained that he was injured as a result of this incident. (*Id.* ¶ 37.) Though he now contends that Defendant "has been unable to name the passenger or provide any details," the evidence he cites is limited to the deposition of Merriweather, who testified that he personally did not have the requested information. (Def.'s 56.1 Resp. ¶ 16; Merriweather Dep., Ex. C to Def's 56.1 [61-3], 76–77.) So far as the court is aware, Plaintiff never sought information concerning the injury victim in any other discovery request and has not established that Defendant lacks information about the victim.

On the day of the incident, Plaintiff did not receive a call from the dispatcher to warn him that the train would be switching from Main Track 2 to Main Track 3. (Def.'s 56.1 Resp. ¶ 10.) Plaintiff admits, however, that regardless of any instructions that he hears or does not hear from a dispatcher, a train engineer is expect to follow the train signals "first and foremost." (Pl.'s 56.1 Resp. ¶ 38; Davis Dep., Ex. B to Def.'s 56.1 [61-2], 46.) Plaintiff promptly reported the incident. (Def.'s 56.1 Resp. ¶ 11.) Plaintiff sought "alternative handling" for this incident and was willing to "admit full responsibility" for the incident. (Pl.'s 56.1 Resp . ¶ 39.) He admits that under the PEPA, he could have been terminated for this violation because it occurred during his one-year probationary period. (*Id.* ¶ 40.) He admits that because this was a dismissible offense, he was not eligible for a Waiver. (*Id.* ¶ 41.) He admits, further, that he had committed the same violation twice in a 24-month period and was still on probation for the previous violation when this one occurred. (*Id.* ¶ 42.) He does not admit that this fact rendered him ineligible for "alternative handling," but cites no evidence that challenges Merriweather's statement that a person who has committed a violation of the same Class I offense in the previous 24 months is ineligible. (*Id.*; Merriweather Aff., Ex. D to Def.'s 56.1 [61-4], ¶ 13.)

## V. Investigation and Discipline

The October 7, 2010 incident could have resulted in Plaintiff's dismissal. In an attempt to "save" his job, Plaintiff's union representative approached Merriweather's supervisor. (*Id.* ¶ 43.) The supervisor conferred with Merriweather, who ultimately permitted Plaintiff to keep his

job, but imposed a 30-day record suspension, a three-year probation, and a ban from working in suburban passenger service. (*Id.* ¶ 44.) Instead, Plaintiff was assigned to freight service. (*Id.*) Plaintiff had switched between passenger and freight service in the past. (*Id.* ¶ 47.) He understood that the purpose for banning him from commuter train service was to eliminate risk; as engineer of a suburban commuter train, he was controlling the movement of a train with eight to ten cars, carrying 500 to 1000 passengers each trip, several times per day. (*Id.* ¶¶ 48, 49.) He also admits that the ban was based on his "two Level S (serious) infractions within a one-year review period,"[2] the injury to a passenger, and his apparent lack of remorse. (*Id.* ¶ 50.) And he admits that Merriweather was not aware of his previous EEOC charge at the time of this decision. (*Id.* ¶ 45.)

Defendant contends that the discipline it imposed on Plaintiff was consistent with the PEPA and the Alternative Handling Agreement. BNSF's factual submissions include a chart identifying 12 white engineers against whom Defendant imposed discipline for rules violations. (Pl.'s 56.1 Resp. ¶ 67.) The chart lists the engineers' names, the rule violation at issue, and the discipline imposed. Plaintiff admits the chart is accurate. (*Id.*) He argues, as more fully discussed below, that BNSF treated several of these white workers more favorably by allowing for "Alternative Handling" in lieu of the discipline they would otherwise have received.

Plaintiff challenged the discipline imposed on him by way of a union appeal to the "Public Law Board"; that Board issued its decision a year later, concluding on November 14, 2011 that Defendant had proved the violations but that a permanent ban from passenger service was excessive and should be lifted. (*Id.* ¶¶ 51, 52.) Plaintiff returned to work on the suburban passenger line in April 2013. (Def.'s 56.1 Resp. ¶ 14.) The union also represented Plaintiff during the investigation hearings. (Pl.'s 56.1 Resp. ¶ 53.) Plaintiff complains that the hearing was postponed several times (Pl.'s Mem. in Resp. to Def.'s Summ. Judg. Mot. [65] hereinafter,

---

[2] This statement is admitted, but the court notes that while October 7, 2010 fell within Plaintiff's one-year probation, that date is in fact more than one year after September 22, 2009.

7

"Plaintiff's Mem.", 3–4), but it is uncontested that it was the local chairman of the Brotherhood of Locomotive Engineers and Trainman Union (that is, Plaintiff's own union representative) who sought these postponements, ultimately proceeding with the hearing in January 2011. (Pl.'s 56.1 Resp. ¶ 54.)

During the time that Plaintiff was barred from working on suburban commuter lines, he was deprived of the opportunity to bid for commuter line positions. (Def.'s 56.1 Resp. ¶ 12.) As a result, he asserts that he was "forced to work nights and off hour . . . in order to maintain similar pay to what he [had been] earning" on the suburban line as an engineer. (Pl.'s 56.1 [67], ¶ 12.) He testified that he retained his seniority, however, and Defendant therefore asserts that he was free to bid for a day shift at another location. (Def.'s 56.1 Resp. ¶ 12, citing Davis Dep. at 105–08.) Plaintiff admits that he earned more when working in freight service than in suburban passenger service: He earned a daily rate of $257.94 in October 2010 for his passenger service work, but earned $429.92 per day for working in freight service. (Def.'s 56.1 Resp. ¶ 13.; Pl.'s 56.1 Resp. ¶¶ 56, 57.) He also received scheduled raises and was earning a daily rate of $484.00 by April 2013. (*Id.* ¶ 58.) It is undisputed that Plaintiff "received an MVP card from Defendant as an award for his excellent performance" during this suspension period. (Def.'s 56.1 Resp. ¶ 15.)

## VI.   Other Claims of Discrimination

Plaintiff believes that he has been denied certain supplemental payments to which he was entitled for performing extra work. (Pl.'s 56.1 Resp. ¶ 61.) He admits, however, that this belief is based on "watching" and what he has heard from time to time. (Davis Dep., Ex. B to Def.'s 56.1 at 134.) He has no record of claims for additional pay submitted by co-workers, nor any evidence concerning whether those claims were accepted or rejected. (Pl.'s 56.1 Resp. ¶¶ 60–63.) He contends that he was denied this additional compensation more frequently after settling his September 2009 EEOC charge, but Christopher Motley, the Senior Trainmaster who approves or rejects these claims was unaware of the filing of the charge until well after Plaintiff

filed this lawsuit. (Def.'s 56.1 Resp. ¶ 8.) Plaintiff also claims that on one occasion, he and two other African-American workers were asked to exceed permissible hours of service; but he admits that this incident occurred prior to the September 22, 2009 discipline and was not mentioned in his EEOC charges. (Pl.'s 56.1 Resp. ¶¶ 64–65.)

## DISCUSSION

Plaintiff alleges in this lawsuit that the discipline Defendant imposed on him in 2011 was a product of discrimination on the basis of race, and of retaliation for his 2009 charge of discrimination. He also alleges a hostile environment and breach of the agreement to settle the 2009 charge. Defendant BNSF seeks summary judgment on these claims. BNSF argues that Plaintiff was disciplined for his rules violations in accordance with BNSF's rules and policies, and that Plaintiff is unable to offer evidence that BNSF was motivated by discriminatory intent or in retaliation for his protected activity.

**I.     Summary Judgment Standard**

The court will grant a motion for summary judgment when "there is no genuine dispute as to any material fact" such that "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court "constru[es] all facts, and draw[s] all reasonable inferences from those facts, in favor of the nonmoving party." *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014) (quoting *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013)). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (internal quotation marks and citation omitted). The moving party has the initial burden to show that the evidence is insufficient to establish a material element of the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the moving party meets this burden, the non-moving party must then "come forward with specific facts showing there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If the evidence supporting the non-moving

party's claim is insufficient for a reasonable jury to return a verdict in its favor, the court will grant summary judgment. *Id.* Conclusory allegations of discrimination, therefore, cannot defeat a summary judgment motion. *See Fischer v. Wayne Dalton Corp.*, 139 F.3d 1137, 1140 (7th Cir. 1998).

## II.  Race Discrimination

Under § 1981 and Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e–2(a)(1). Plaintiff Davis argues that he can prove a claim of intentional discrimination both by presenting direct or circumstantial evidence of a discriminatory motive (the "direct method") or by the indirect method of proof. To prove race discrimination under the direct method, Davis must present "direct or circumstantial evidence that creates a convincing mosaic of discrimination on the basis of race." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 674 (7th Cir. 2012). Alternatively, under the indirect method, Davis must establish that (1) he is a member of a protected class; (2) his job performance met BNSF's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly-situated individual outside his protected class was treated more favorably. *Swearnigen–El v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 852, 860 (7th Cir. 2010).

Plaintiff argues that he has proven his claims under both methods. With respect to the direct method, he refers to a "chain of events starting with his return to work following his 2009 claims against Defendant and culminating in discipline that the Public Law Board called excessive." (Pl.'s Mem. at 6.) Apart from the 2009 discipline and the 2011 discipline, however, he identifies no other links in the purported chain. Instead, Plaintiff's argument for a "convincing mosaic of circumstantial evidence" rests on his belief that he was disciplined more harshly than any other employee. Because Plaintiff's indirect method case also rests on his belief that

10

similarly-situated workers were treated more favorably, the court addresses this issue as part of its analysis of Plaintiff's "indirect method" proof.

To establish his case under that method, Plaintiff must establish that he (1) is a member of a protected class; (2) met his employer's legitimate expectations; (3) suffered adverse action; and (4) was treated less favorably than similarly situated individuals outside the protected class. *Antonetti v. Abbot Labs.*, 563 F.3d 587, 591 (7th Cir. 2009). The court agrees with Plaintiff that two of these elements require little discussion: As an African-American worker, Plaintiff is a member of a protected class. And the discipline he received in 2011 constitutes adverse action. Though his suspension from suburban commuter service and assignment to freight did not result in overall diminished compensation, Plaintiff contends he managed this by means of bidding on undesirable night shifts, and the reassignment was indeed a penalty.

Whether Plaintiff was meeting his employer's legitimate expectations is contested. Defendant notes Plaintiff's two serious rules infractions in a 13-month period. (Def.'s Reply Mem. [69], 5.) Plaintiff emphasizes the relative infrequency of rules violations over his three-decade career and his receipt of an MVP card during his most recent suspension. (Pl.'s Mem. at 8.) Because the real dispute in this case is whether the discipline imposed on Plaintiff was more harsh than what his co-workers received in similar circumstances, the court is inclined to resolve this issue in Plaintiff's favor as well. *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (analysis of the "meeting legitimate expectations" and "similarly situated" inquiries merge where plaintiff contends the employer applied legitimate expectations in a disparate fashion).

In support of his argument that he was treated differently than white employees in similar circumstances, Plaintiff points to five employees whose names appear on Defendant's chart: Brian Oliver, Gary Popec, Rick Pratt, Robert Weingartner, and Michael Frieders. (Pl.'s Mem. at 9-10.) For four of these employees, the reason they received more favorable treatment is straightforward. Popec, Pratt, Weingartner, and Frieders were granted "alternative handling" for

their offenses. As set forth in Defendant's chart (and admitted by Plaintiff, *see* Pl.'s 56.1 Resp. ¶ 67), each of those employees was eligible for "alternative handling" because "he took responsibility for his violation" and because he did not have a Class I serious violation in the previous 12 months, nor did he have a violation of the same Class I serious offense in the previous 24 months. In fact, Popec, Weingartner, and Frieders had no previous discipline at all. Pratt's most recent previous discipline had occurred in 1984. BNSF's reliance on a discipline policy that considers an employee's past disciplinary record does not appear to be a pretext for discrimination.

That leaves Brian Oliver, who on September 17, 2010, failed to operate a train at the required speed. This was not a "Dismissible Offense," and Oliver was permitted a "Waiver" of the investigative hearing. Oliver had received "alternative handling" for an incident just one year earlier because, like Popec, Weingartner, and Frieders, he had no previous discipline in September 2009 and had acknowledged and accepted responsibility for the violation. That "alternative handling" episode meant that Oliver had no disciplinary record as of September 2010 when his second infraction occurred. It did, however, render him ineligible for a second instance of "alternative handling." Instead, he was disciplined by way of a record suspension and a one-year probation. Neither Oliver's offense, nor his disciplinary history, was as troublesome as Plaintiff's.

Plaintiff also makes passing reference to a handful of other employees (Pl.'s Mem. at 10–11), but the circumstances they present are similar to those of the five workers already discussed, and are insufficient to defeat summary judgment. Kellan Smith had no prior serious offenses when he incurred a safety violation in October 2010. James Dvorak's circumstances are nearly identical to Oliver's: when he incurred a violation by failing to blow a whistle in October 2009, his only previous discipline had been the subject of "alternative handling." William Hartrick received a one-month actual suspension and three years of probation for his failure to stop in February 2011; this was not a dismissible offense because Hartrick's last

violation occurred more than 12 years earlier. Both Casey Robertson and Sady Rivera operated at an improper speed in April 2010. Both received 30-day record suspensions and one-year probations. Neither had significant prior discipline. Plaintiff's last comparator, Steven Joseph, received a suspension and one year probation for occupying a main track without authority, but because that discipline was imposed in 2000, before adoption of the PEPA, Joseph is not similarly situated to Plaintiff.

Plaintiff views these records with suspicion. He "knows of no Caucasian employees of Defendant who, having been disciplined, were ever banned from operating trains on Defendant's Suburban Services line." (Pl.'s Mem. at 4.) But as Defendant asserts, "Davis has not identified a single individual who was allowed to keep his or her job after committing a second Serious level offenses [sic] within a 12-month period, when alternative handling was not warranted for the first offense." (Def.'s Reply at 6.) Indeed, the worker whose record appears to be most similar to Plaintiff's is Patricia Leavitt, who failed to stop before a signal in May 2011. This was Ms. Leavitt's second serious violation, and like Plaintiff's, it occurred while she was on probation for the first one. Ms. Leavitt was not banned from the Suburban Services line; she was dismissed outright. As Defendant notes in its brief, BNSF policies would have permitted BNSF to terminate Plaintiff's employment after the October 2010 incident.

The Seventh Circuit has repeatedly explained that a court is not a "a super-personnel department that second-guesses employer policies that are facially legitimate. '[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.'" *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 464 (7th Cir. 2014), quoting *Harper v. C.R. England, Inc.*, 687 F.3d 297, 311 (7th Cir. 2012). On this record, the court concludes only that BNSF did not treat Plaintiff unfavorably by reassigning him.

13

### III. Retaliation, Hostile Environment, Breach of Contract

Plaintiff's remaining claims require only brief discussion. He alleges that the discipline imposed on him in 2011 was a function of retaliation for his 2009 EEOC charge. Like race discrimination, a claim of retaliation claim may be established using either the direct or indirect methods of proof. *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 n.2, 983 (7th Cir. 2014). The direct method requires evidence of a causal link between protected activity and an adverse employment action, *see Coleman v. Donahoe*, 667 F.3d 835, 859 (7th Cir. 2012), while the indirect method requires evidence that a similarly-situated employee who did not engage in protected activity was treated more favorably, *see Silverman v. Bd. of Educ. of Chi.,* 637 F.3d 729, 742 (7th Cir. 2011). Plaintiff has not established a dispute of fact under either of these methods.

The only purported retaliatory treatment Plaintiff has identified is being denied certain supplemental payments, being treated "more distantly" by dispatchers (Def.'s 56.1 Resp. ¶ 8), and the October 2011 discipline. But the individual who denied the pay claims, Christopher Motley, has asserted he was unaware of Plaintiff's 2009 charge, and Plaintiff offers nothing to rebut that assertion. The evidence that dispatchers treated Plaintiff "distantly" fails because there is no evidence the dispatchers were aware of his charge, either. Moreover, that claim rests solely on testimony too vague to support a finding of unlawful treatment ("other counterparts" were "on first-name basis" with the dispatcher, but "it's like I'm a second citizen") (Davis Dep. at 140). Plaintiff's challenge to the October 2011 discipline fails for the same reasons his race discrimination claim fails, and because Mr. Merriweather, also, was unaware of the previous charge of discrimination. In any event, the length of time that passed between the charge of discrimination and the discipline, and the significant intervening event (the rules infraction), defeat any inference of retaliation. *See Kidwell v. Eisenhauer,* 679 F.3d 957, 967 (7th Cir. 2012).

Plaintiff's hostile environment claim fares no better. To establish an actionable hostile environment claim requires evidence "(1) that the work environment was both subjectively and objectively offensive; (2) that the harassment was based on membership in a protected class; (3) that the conduct was severe or pervasive; and (4) that there is a basis for employer liability." *Mendenhall v. Mueller Streamline Co.*, 419 F.3d 686, 691 (7th Cir. 2005), citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21 (1993). In determining whether such a showing has been made, the court considers the frequency and severity of the misconduct; whether it is physically threatening, and whether it interferes with the employee's performance. *Casino Queen*, 739 F.3d at 982. The circumstances Plaintiff points to—denial of special claims for compensation, delays in his disciplinary proceeding (at the behest of the union representative, not Defendant) and the October 2011 discipline—are not severe, are not physically threatening, and did not interfere with Plaintiff's job performance. Indeed, as he notes, he won "MVP" recognition soon after being reassigned to work on freight trains.

Finally, the court's determination that Defendant did not discriminate against Plaintiff defeats his claim that BNSF breached the settlement agreement.

## **CONCLUSION**

Defendant's motion for summary judgment [60] is granted.

ENTER:

Date: March 30, 2015

_____
REBECCA R. PALLMEYER
United States District Judge